Jb61huds

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4              v.                        18 Cr. 454 (KPF)

5   DARRELL HUDSON,

6                  Defendant.            Sentencing

7   ------------------------------x

8                                        New York, N.Y.
                                         November 6, 2019
9                                        3:04 p.m.

10

    Before:
11
                     HON. KATHERINE POLK FAILLA,
12
                                         District Judge
13

14                      APPEARANCES

15  GEOFFREY S. BERMAN
         United States Attorney for the
16       Southern District of New York
    BY:  FRANK J. BALSAMELLO
17       Assistant United States Attorney

18  MOSKOWITZ & BOOK, LLP
         Attorneys for Defendant
19  BY:  AVRAHAM C. MOSKOWITZ, ESQ.

20

21

22

23

24

25

Jb61huds

1        (Case called)

2        THE DEPUTY CLERK:  Counsel, please state your name for

3    the record, beginning with the government.

4        MR. BALSAMELLO:  Good afternoon, your Honor.  Frank

5    Balsamello for the United States.

6        THE COURT:  Good afternoon.  Thank you.

7        MR. MOSKOWITZ:  Good afternoon, your Honor.  Avi

8    Moskowitz on behalf of Mr. Hudson, who's seated to my left.

9        THE COURT:  Sir, good afternoon to you.

10       Mr. Hudson, good afternoon to you.

11       THE DEFENDANT:  Good afternoon.

12       THE COURT:  Okay.  Thank you very much.

13       Let me please begin by making sure I have the

14   materials that I should have.  I have a presentence

15   investigation report that is dated August 28th of 2019; I have

16   a defense sentencing submission that is dated October 23rd of

17   2019, with letters from supporters; I have a government

18   sentencing submission that is dated October 30th of 2019; and I

19   have a supplemental defense submission that is dated

20   November 4th.

21       Mr. Moskowitz, should I have anything else on behalf

22   of your client?

23       MR. MOSKOWITZ:  No, your Honor.

24       THE COURT:  Thank you.

25       Mr. Balsamello, anything else on behalf of the

Jb61huds

1    government?

2              MR. BALSAMELLO:  No, your Honor.

3              THE COURT:  Mr. Balsamello, has the government had a

4    sufficient opportunity, under Federal Rule of Criminal

5    Procedure 32, to review the presentence investigation report in

6    this case?

7              MR. BALSAMELLO:  We have.

8              THE COURT:  Do you have any objections to its

9    contents?

10             MR. BALSAMELLO:  We don't.

11             THE COURT:  It does recite a different guidelines

12   calculation, am I correct?

13             MR. BALSAMELLO:  It does.

14             THE COURT:  And I understood from your sentencing

15   submission that you agree with that guidelines calculation.

16             MR. BALSAMELLO:  We accept their criminal history

17   calculation as III as opposed to IV.

18             THE COURT:  Okay.  Thank you very much, sir.

19             Mr. Moskowitz, similar questions.  Have you and has

20   Mr. Hudson had a sufficient opportunity, under Federal Rule of

21   Criminal Procedure 32, to review the presentence investigation

22   report in this case?

23             MR. MOSKOWITZ:  Yes, your Honor.

24             THE COURT:  Do you have any objections to its

25   contents?

Jb61huds

1          MR. MOSKOWITZ:  No, your Honor.

2          THE COURT:  I am imagining that you agree with the

3  government that the probation office has accurately or perhaps

4  more accurately calculated your client's criminal history

5  category.

6          MR. MOSKOWITZ:  That's correct.

7          THE COURT:  As well, sir, have you and your client had

8  an opportunity to review the conditions that are contained at

9  the back of the presentence investigation report, beginning at

10  page 20?  I call them and you will know them as the mandatory,

11  standard, and special conditions of supervised release.

12          MR. MOSKOWITZ:  Yes, your Honor, we've reviewed the

13  entire report.

14          THE COURT:  Do you have any objection to any of the

15  proposed special conditions?

16          MR. MOSKOWITZ:  No, your Honor.

17          THE COURT:  I will ask you and I will ask your client,

18  are you comfortable, sir, if I refer to them collectively as

19  the mandatory, standard, and special conditions of supervised

20  release without reading them individually into the record?

21          THE DEFENDANT:  Yes.  Yes.

22          THE COURT:  I think I understood the "yes" from you

23  and your client to mean yes, you reviewed these things and you

24  don't need me to read them word for word into the record.

25          MR. MOSKOWITZ:  That is correct, your Honor.

Jb61huds

1          THE COURT:  That is fine.  I can tell by the grins on

2     your faces that you understood what I was saying.

3          Mr. Balsamello, does the government seek restitution

4     or forfeiture in this case?

5          MR. BALSAMELLO:  No, your Honor.

6          THE COURT:  Then lest I forget to do so, I will adopt

7     the presentence investigation report, the factual statements

8     that are contained in it and the guidelines calculations that

9     are contained in it as well.

10          Mr. Balsamello, a couple of housekeeping matters,

11     please, sir.

12          I'm a little bit confused, but I think it can be

13     remedied.  I believe the government states in its letter to me

14     that Mr. Hudson has 22 arrests, or -- yes, more than 20 arrests

15     and eight convictions, distinguishing him from Mr. Padilla, who

16     had 18 arrests and four convictions.  I don't know that all the

17     arrests are contained in the presentence investigation report.

18     If they are, please let me know that they are, and if they are

19     not, could you let me know where that number came from.

20          MR. BALSAMELLO:  They certainly are all not in the

21     presentence report.  Probation never includes arrests that are

22     sealed or for whatever other reason don't appear in the rap

23     sheet that probation can access.  So we have unsealed records.

24          THE COURT:  One moment, please, sir.  Let's pause for

25     a moment, let folks sit down.

Jb61huds

1           Thank you.

2           I am understanding from the hand gestures I am

3    receiving that the folks who are here are here to support

4    Mr. Hudson this afternoon.  They are certainly welcome.

5           AUDIENCE MEMBERS:  Thank you.

6           THE COURT:  Mr. Hudson, you see you have people here

7    for you?

8           THE DEFENDANT:  Yes.

9           THE COURT:  Thank you.

10          Mr. Balsamello, I'm going to let you continue, please,

11   and if you need to restart, I certainly understand.

12          MR. BALSAMELLO:  No, your Honor.

13          So the probation office goes by the rap sheet that

14   they have.  We have unsealed records from the New York City

15   Police Department that list all arrests regardless of whether

16   they have been sealed.  Sometimes cases are sealed because they

17   result in a conditional discharge, and if the defendant

18   completes the period during which he's expected not to commit

19   new crimes, he is allowed to withdraw his plea or things like

20   that.  There are various reasons the state may seal or dispose

21   of the case.  It may have been dismissed outright.

22          THE COURT:  But let me pause for a moment, just to

23   push back.  Might one reason for the dismissal and sealing of

24   the case be a recognition that perhaps they got the wrong man

25   or that there was something infirm with the arrest itself?

Jb61huds

1   What I'm going to -- and I'm sure you'll figure this out on

2   your own -- is that someone who's been arrested 20 times with

3   no convictions is arguably differently situated than someone

4   who's been arrested 20 times with 20 convictions.

5            MR. BALSAMELLO:  Certainly.

6            THE COURT:  And so I don't know what you wish me to

7   make of arrests that are not contained in the presentence

8   investigation report and that did not result in any criminal

9   justice sentence.

10            MR. BALSAMELLO:  I think there are two things I would

11   suggest your Honor to take note of.  First is just the

12   consistency of law enforcement contact, and regardless of

13   whether he had committed the crime for which he was arrested on

14   that 20th arrest, he nevertheless, having been put in handcuffs

15   20 times, continued to commit criminal activity in the same

16   community where he had been arrested so many times before.  So

17   simply the number of contacts with law enforcement has not

18   acted as a deterrent, regardless of whether the conduct

19   underlying those arrests -- whether the arrests were valid,

20   whatever they were for, the mere occurrence of the arrests and

21   detention on some kind of charge had no effect on Mr. Hudson in

22   terms of deterrence.  That's one thing I would suggest your

23   Honor could draw from it.

24            The second thing, and actually, the primary reason, or

25   a primary reason that I cited it here is that I believe

Jb61huds

1    Mr. Moskowitz had compared Mr. Hudson to Mr. Padilla in terms

2    of their arrests or convictions.  Mr. Moskowitz, probably

3    looking at our sentencing submission or maybe the defense

4    sentencing submission, and he made a comparison between the

5    two, and so I was highlighting the difference.  To the same

6    degree that 12 of Mr. Hudson's arrests didn't result in

7    conviction, 14 of Mr. Padilla's didn't.  I'm simply

8    demonstrating in that comparison, in that statement, at least,

9    that if we're looking at data points with those two defendants

10   in the case, Mr. Hudson has been both arrested and convicted

11   more times than Mr. Padilla.

12           THE COURT:  I see.  Is there a reason -- well, there

13   is a reason, of course.  Mr. Padilla had a larger quantity

14   attributed to him than Mr. Hudson, am I correct?

15           MR. BALSAMELLO:  Yes.

16           THE COURT:  And yet I thought I understood from your

17   submission that in part Mr. Hudson was a supplier to

18   Mr. Padilla.  Am I also correct?

19           MR. BALSAMELLO:  Yes.

20           THE COURT:  Okay.

21           MR. BALSAMELLO:  I want to make sure the word

22   "supplier" is sort of understood in the context of the way

23   these guys operated.  He was not supplying Mr. Padilla kilos at

24   a time.  We're not talking about sort of trafficker-level

25   duffel bags full of drugs here, but he would be supplying --

Jb61huds

they often did flip, where someone who was effectively a

customer would get enough product or bring a customer to get

his own and serve the customer that he was bringing to, in this

case, Mr. Hudson.  So we're talking still about street-level

quantities where Mr. Padilla was sort of facilitating further

sales or getting from Mr. Hudson to make his own sales of

street-level quantities.

THE COURT:  And that's my question.  I want to make

sure I understand precisely what you mean when you use the term

"flips."  And you may have already told me all that I need to

know about it, but I am going to ask you please to repeat

yourself just so that there's no misapprehension on my part as

to what you mean when you use the term.

MR. BALSAMELLO:  This is what we understand from the

wiretaps in the case.  We're listening to calls, and from the

way the cooperators explain them, and it's not -- I don't know

that there's sort of a fixed, rigid way that it was done or if

it was sort of a term used that could apply to a couple of

slight variances.  But if Mr. Padilla wanted product for

himself to use but didn't have the full amount to pay for what

he wanted for himself, and had another customer, knew someone

else who wanted also, he could facilitate that person getting

from whoever Mr. Padilla was going to get it from at that

time -- in some instances it was Mr. Hudson -- and by

facilitating an additional sale, he would be getting credit,

Jb61huds

1    he'd be paying less for his own product.  I think sometimes

2    that was done with actually bringing a customer to the person

3    who was selling.  I think it could also have been accomplished

4    by more or less consignment-type relationship between the

5    person who was giving the flip and the person receiving it.  So

6    Mr. Padilla could have received the product up front or paid

7    half for it and made his money back when he was reselling to

8    someone else.  It accomplishes the same thing as getting

9    product on consignment.  But we're talking about I think more

10   transaction-by-transaction street-level quantities as opposed

11   to a consignment relationship, where someone's getting 10 grams

12   and then pays back a thousand dollars later.  Here I think

13   we're talking more a few bags at a time and flipping them to

14   another customer.

15           THE COURT:  Excuse the analogy, sir.

16           MR. BALSAMELLO:  Sure.

17           THE COURT:  If I refer someone to my chiropractor, my

18   next adjustment is discounted or may even be free.  Is that

19   what you're talking about hear?  By bringing another customer,

20   the charge that you yourself would be assessed is lessened?

21           MR. BALSAMELLO:  I think so.  From the calls, from the

22   way they talked about them, that sounds like what may have been

23   occurring.  We also have spoken to a witness who I think used

24   the term also to refer to -- it doesn't quite work with a

25   chiropractor service, but if Mr. Hudson fronted work, fronted

Jb61huds

1    product to Mr. Padilla --

2              THE COURT:  Yes.

3              MR. BALSAMELLO:  -- at a discount, and then he was

4    able to resell it to make his money back.  So I think there are

5    different ways.  There may have been a slight variance in terms

6    of what it meant.  At the end of the day, the material contours

7    here are that Mr. Hudson was selling to Mr. Padilla and

8    providing product to Mr. Padilla, either directly to be given

9    to another customer or to another customer who was coming with

10   Mr. Padilla.

11             THE COURT:  I see.  Okay.

12             MR. BALSAMELLO:  I will note also that part of the

13   difference in the drug weight accounts for the duration, and

14   there were a number of convictions for Mr. Padilla dating back

15   I think earlier than the closest relevant conduct or the most

16   distant relevant conduct for Mr. Hudson.  Mr. Padilla had older

17   relevant conduct.  So we were looking at an aggregating weight

18   over a longer period of time for Mr. Padilla.  In terms of the

19   day-to-day, the difference in weight was not intended to

20   reflect the difference in their day-to-day within the

21   conspiracy period specifically.  As noted, just in terms of the

22   number of buys we had and the wire intercepts, there's no

23   indication that Padilla was moving more product than Mr. Hudson

24   was during those years.

25             THE COURT:  But it seems there was a bit of a tradeoff

Jb61huds

```
1    because Mr. Padilla had a higher quantity but a lower criminal

2    history, because were the arrests folded in or considered

3    relevant conduct to the case?

4              MR. BALSAMELLO:  Correct.  And that's why the

5    weight -- under historical arrests like that that we deem

6    relevant, the obvious part of that is then acknowledging the

7    fact that he was engaged in drug sales in the same course of

8    conduct dating back that far, and so the weight is obviously

9    increased as part of that.

10             THE COURT:  Okay.  All right.  One moment, please,

11   sir.

12             MR. BALSAMELLO:  Yes.

13             THE COURT:  Mr. Balsamello, I'll hear you now on

14   sentencing.  And again, because we're still relatively new into

15   the sentencings in this case, I want to make sure I understand

16   the government's position as to Mr. Hudson's significance, his

17   criticality to the charged conspiracy, any role that he might

18   have.  I do see a criminal history that includes episodes of

19   violence and episodes of possession of a weapon, which is, of

20   course, a cause for concern to me.  I did not understand that

21   there was any violence by Mr. Hudson or even a threat of

22   violence in the charged conspiracy.  Separate from that,

23   anything else you'd like me to know.  Thank you.

24             MR. BALSAMELLO:  Thank you, your Honor.

25             So I'll start with I think, generally speaking, about
```

Jb61huds

1    the seriousness of the conduct, and I'll address some of the

2    questions you just asked in that context.

3            I believe when we were here with Mr. Padilla, your

4    Honor asked a very similar question about sort of whether

5    anything can be drawn from the ordering of the defendants on

6    the indictment and how do they fall here.  And I believe my

7    answer then was that below Mr. Nelson, Mr. Crooms, and

8    Mr. Corley, they could have been shuffled in a lot of different

9    ways.  They are more or less the dealers who were selling those

10   three individuals' products.  Mr. Nelson I think at times

11   supplied Mr. Crooms and Mr. Corley, and Mr. Corley and

12   Mr. Crooms then supplied other people below them.  Mr. Nelson

13   also sometimes directly supplied people who were -- to all of

14   them.  Mr. Hudson was one of the dealers there.  He was selling

15   day in, day out, I think as indicated by the fact that in the

16   course of this investigation alone, he made 18 sales to an

17   undercover officer or a confidential informant, so whenever he

18   was looked for by someone either with law enforcement or acting

19   on law enforcement's behalf to sell product, he did so.  He had

20   crack products.  He also sold -- I believe in one or two of the

21   transactions there was a quantity of heroin that was sold.  So

22   he was selling multiple drugs, and he was doing so routinely.

23   That was a means of making money, day in, day out, for

24   Mr. Hudson.  And the effect that that has on the community, it

25   sounds -- I know we discussed this at prior sentencings as

Jb61huds

```
1    well.  People below the supplier level, even the street-level
2    dealers who may not be, you know, making an enormous fortune
3    from the activity, have an incredibly harmful effect on this
4    community.  We're talking about apartment buildings that are
5    not doomed based on where they are or how they're constructed.
6    These buildings that we call "projects" and then just sort of
7    assign a label, as if whatever happens there happens because
8    they are "the projects" or they're "the houses."  It's almost
9    talked about like, well, of course there's drug activity there.
10   That's not an automatic thing.  Mr. Hudson is one of the
11   people, the other conspirators in this case are the people who
12   park in the hallways of these buildings, who cook the products,
13   who, day in and day out, when parents are taking their kids to
14   school, when people are going to and from work -- and there are
15   law-abiding people in these communities -- when those people
16   are going about their lives, they're passing Mr. Hudson and
17   other defendants in this case slinging drug products.  And
18   while Mr. Hudson is not, as part of this case, known to have
19   engaged in drug-related violence -- your Honor is correct, we
20   don't have a firearm enhancement here or any acts of
21   violence -- the conspiracy itself and drug activity in the
22   Lambert Houses generally has spawned a great deal of violence.
23   And it is something that responsibility for always becomes so
24   diffuse because everyone who deals, who doesn't personally
25   perpetrate an act of violence, says, well, I wasn't the one
```

Jb61huds

with the gun, I didn't have anything to do with that, but the

drug trade in these places, it's an economy, it's a market, and

Mr. Hudson certainly was a part of that, and there have been

shootings there, there has been significant violence there in

recent years.

         Mr. Hudson does have a significant criminal history.

He does have eight convictions.  Putting completely to the side

arrests that didn't result in convictions, he has eight

convictions.  One of them was for a firearm in 2013.  He was

sentenced to a year.  That obviously did not accomplish the

goals of sentencing.  He was not deterred from that.  One of

his more recent arrests resulted in a one-year conditional

discharge.  And one of the conditions, at least, that

Mr. Hudson should have been abiding by to get that case

discharged and sealed, as I believe it was, was that he not

commit new crimes, and I believe during the year period while

he was under that condition, he made 16 of the 18 controlled

sales.  So while already being sanctioned by courts, while

already being caught by law enforcement for these things,

Mr. Hudson kept doing it.  Part of the issue is how many

arrests and how many cases like this in the state just go on

and on until someone gets here and then is facing what is, I

completely acknowledge, a significantly longer guidelines

sentence than any equivalent state case he has faced.  But he

has time and again faced these, faced state charges for drug

Jb61huds

1   offenses or a gun, and they haven't accomplished the goal.

2   They haven't, apparently, left Mr. Hudson in a place where he

3   has decided he will turn away from criminal activity.  For that

4   reason, we believe that there is a significant need here for

5   specific deterrence and to promote respect for the law, and to

6   punish Mr. Hudson and his co-conspirators for what they do in

7   this community and the effect that the narcotics activity there

8   has on the people who live there.

9          I'll also note that in cases like this, where there

10  are multiple defendants from a relatively concentrated area,

11  who everyone knows to be the drug dealers in the area, when

12  they are taken in a federal case, people in the community know

13  that.  In another case, I have seen a text message from one

14  defendant to another, or from one of the defendant's brothers

15  to the defendant, with the press release from this case,

16  saying, "The Feds are here, gettin' serious," something to that

17  effect.  There is a need for general deterrence; there's a need

18  for people who, time after time after time, are caught in the

19  state and end up with misdemeanors or conditional discharges

20  and continue with these long-running drug conspiracies that

21  when a case like this finally hits, the consequence comes with

22  it.  That is, we think, an important aspect of cases like this

23  and that there is a general deterrent value of people

24  recognizing that at some stage there will be a real sentence to

25  face if they continue to get caught and continue to engage in

Jb61huds

1    the activity.

2            So under the guideline range that probation

3    calculates, which is already quite a bit lower than the one

4    that the parties stipulated to, but we accept that that is the

5    range, 70 to 87 months, we believe that it is appropriate and

6    warranted here, and necessary.  Mr. Padilla received 66 months,

7    and we believe that 70 to 87 is a range that very fairly and

8    appropriately accounts for Mr. Hudson's conduct, his place

9    relative to his co-defendants, and would accomplish the goals

10   of sentencing.

11           THE COURT:  But is it your view that in certain

12   material respects Mr. Hudson and Mr. Padilla are similarly

13   situated, or is it your view that by any metric Mr. Hudson is

14   more culpable or deserves a greater punishment than

15   Mr. Padilla?

16           MR. BALSAMELLO:  I think they're similar only in the

17   respect that they were street-level drug dealers.  I think when

18   you just categorize them that way, they fit that general bill.

19   When you look at the extent of criminal history, different

20   numbers of convictions, Mr. Hudson having one of them for a

21   gun, he has double the number of prior convictions Mr. Padilla

22   did, I think that fact alone speaks to a difference between

23   them.  I think the fact that Mr. Padilla was coming to

24   Mr. Hudson at times for product speaks to a slight difference

25   in their relationship.  That's not to mitigate anything

Jb61huds

1   Mr. Padilla did.

2            THE COURT:  No.

3            MR. BALSAMELLO:  We argued for a guidelines sentence

4   with him as well and believe that to be appropriate.  But here,

5   comparing the two of them, I know Mr. Moskowitz, in his view,

6   argued that Mr. Hudson may actually be less culpable or

7   deserving of a lower sentence, and the government certainly

8   sees no basis for that.  The only places where they can be

9   distinguished is a way in favor of a greater sentence for

10  Mr. Hudson.

11           THE COURT:  Thank you very much.

12           MR. BALSAMELLO:  Thank you.

13           THE COURT:  Mr. Moskowitz, I'll hear from you now.

14           MR. MOSKOWITZ:  Judge, I'm not going to even attempt

15  to downplay the significance of drug dealing in the

16  neighborhood.  I accept what Mr. Balsamello says about the

17  effect on the neighborhood.  I think we can all agree with

18  that.

19           The real issue here, Judge, is your Honor has to

20  decide what is sufficient but not greater than necessary to

21  accomplish the goals of sentencing set out in 3553(a).  And 60

22  months, five years, the mandatory minimum in this case, is a

23  substantial sentence, and it is sufficient to accomplish the

24  goals of sentencing.

25           As Mr. Balsamello correctly pointed out, Mr. Hudson

Jb61huds

has quite a number of arrests.  I take exception, I will note,

with drawing any real inference from law enforcement contact.

Arrests are sealed for a lot of good reasons.  When they are

sealed but nonetheless require criminal history points,

probation includes them; when they're, for example, juvenile

offenses.  When they do not require criminal history points,

they're sealed and probation doesn't consider them.  It usually

means they're dismissed or there was an ACD or something like

that.  But no inference should properly be drawn from police

contact.  We certainly know that Mr. Hudson was living in a

neighborhood during the period of time of stop and frisk, and

police contact during that period of time certainly fell

unfavorably heavily on minorities.  And many of those arrests,

as we know from Mr. Hudson's criminal history, were just

dismissed and sealed.  So I don't think your Honor should draw

any inference at all from that.

        With respect to his convictions, I would point out the

most serious one, which is the possession of a weapon, for

which he got one year, was eight years ago, at the age of 21.

Mr. Hudson is now 30, and as I'm going to discuss with the

Court, I think Mr. Hudson really has made substantial progress

towards moving out of the life that he once had, and he's going

to talk to you about that too in terms of what his plans are

and what his hopes are.  But as serious as it was, he did his

time for it, and it was a substantial period of time ago.  And

Jb61huds

1    so while clearly it is of concern, and any weapons possession

2    is of concern, it was not accompanied by acts of violence,

3    thankfully, and since that time, since 2011, there hasn't been

4    a repeat, despite other, shall we say police contact, or even

5    arrests and convictions.

6         The reality, Judge, is that Mr. Hudson is, in many

7    respects, unexceptional in terms of the types of defendants

8    that your Honor sees, or the court here sees in drug cases.

9    He's a street-level drug dealer.  I really believe that an

10   attempt to call him a supplier when he's selling a couple of

11   bags to somebody who then may sell one of those bags to

12   somebody else so that he can pay for the drugs is a vast

13   overstatement.  Sell somebody four bags and he uses two to get

14   the money to buy the four, that could hardly really be called a

15   supplier.

16        But really, with respect to Mr. Hudson, while the

17   organization had a lot of people in it and Mr. Hudson worked

18   for it for a period of time, he was your basic street-level

19   dealer.  And for someone of that nature to get five years on a

20   case is a lot of time.  There's no other way to put it.  Those

21   of us who are in the business, who are in court dealing with

22   these cases all the time, we kind of lose sometimes perspective

23   on exactly how much, you know, time that is.  Five years is a

24   lot of time in somebody's life.  It's at the moment, you know,

25   20 percent of his life, almost 20 percent of his life.  So it

Jb61huds

constitutes a severe sentence.  It's much greater than anything

he's ever had.  And it is going to have a deterrent effect.

And I submit to the Court that the extra ten months that would

come at the bottom end of the guideline range is not going to

make a difference in terms of deterrence for Mr. Hudson, nor is

it going to have a significantly greater general deterrent

effect.  Nobody's going to say, boy, if I can get 60 months,

I'll sell the drugs, but if I get 70 months, I'm not going to

sell the drugs.  That's not the type of calculation -- and

nobody is going to think that a 60-month sentence is lenient

but a 70-month sentence is severe or draconian, and that's not

going to be the factor that's going to change somebody's mind

in terms of, if you're sending a message to the public that

we're not going to tolerate this behavior.

        I think actually, to a certain extent, you know, when

we talk about just punishment, certainly a five-year sentence

for a street dealer is just punishment.  Because it's viewed in

the context of a conspiracy.  Again, clearly recognizing if

this were in the state situation, if this were a state case,

this would be much less.  Obviously it's not, and he's facing a

mandatory minimum, and that is a substantial sentence.

        Now it's interesting; in my discussions with

Mr. Hudson and talking about his background and sitting and

listening to him talk about his background in the context of

the probation interview, it struck me he's had a very difficult

Jb61huds

1   upbringing, a mother who was not available, who had her own

2   substance abuse problems, a father who was not available.

3           THE COURT:  Could we pause to appreciate the very sad

4   irony of that, that in watching the absence of his mother, he

5   actually went into the very profession that caused her to be

6   absent?

7           MR. MOSKOWITZ:  Yes, Judge.  I understand that.  And

8   it is tragic, and it is ironic in many respects.  But you don't

9   get there -- you don't think about it in that context.  There's

10  a lot of things that go on until you get to that point.

11  Clearly there's a whole environment that one grows up with.

12  And the point I was making, Judge, is that to me, when I heard

13  Mr. Hudson's biography, it sounded sad, in fact tragic in many

14  respects, and yet when Mr. Hudson wrote to the Court, he wrote

15  to the Court about being raised by his grandparents and the

16  love that he got from them and how wonderful that was.  And

17  yes, that shows a certain maturity on his part and a certain

18  appreciation for things that he had.  As tough as it was, it

19  wasn't as tough, clearly, as many others who come into this

20  courthouse, because he had people who cared for him.  And now

21  we're actually seeing that those who care for him are still

22  around.  His aunts are here.  And in fact his father is here,

23  which is a testament to him.

24          So Mr. Hudson, I think it takes a lot to understand

25  that with all the difficulties that he had in his family life

Jb61huds

1    and in his personal life, yet he appreciates the fact that

2    there were people who did care for him and tried their hardest.

3    And clearly his grandparents, he was a little bit much for

4    them, and it was very difficult for them to deal with him, and

5    that has to do with his own issues.  You know, Mr. Balsamello

6    is correct.  His ADHD and his depression or bipolar disorders,

7    those aren't excuses for what he did, but what they do reflect

8    is the difficulties that he had in his life that made it

9    difficult for his grandparents to keep him under control and

10   why, how he ended up out on the street where he ended up.  And

11   a lot of the poor judgment that comes from those disorders,

12   untreated, help explain -- not justify, not excuse, but help

13   explain how he ended up where he ended up.  And it's been my

14   experience that drug use -- and Mr. Hudson clearly had a

15   substantial history of drug use, mostly marijuana and alcohol.

16   Those go hand and hand with the type of psychological disorders

17   that he had.  People, young men particularly, with ADHD very

18   often use marijuana and alcohol as self-medication because it

19   helps calm them down.  And that's certainly an issue that

20   Mr. Hudson suffered from.

21           My relationship with Mr. Hudson, such that it is, it's

22   a relatively short one, but my involvement with him, in my

23   speaking to him, my meetings with him, indicate to me that he

24   really is dedicated now to moving on from this.  And I think

25   his letter to the Court simply and straightforwardly tries to

Jb61huds

1    accomplish that, and Mr. Hudson I think is going to talk to

2    that.

3            What is worth noting, because it's not always the case

4    in these cases, is Mr. Hudson has managed to keep a clear

5    disciplinary record.  When I went to see him last, I'd actually

6    got to see him not wearing his prison uniform but wearing his

7    kitchen uniform, because he is a cook in the kitchen, and it is

8    something that he is passionate about, something that I think

9    he would like to go to work in when he gets out, and whatever

10   sentence your Honor gives him, he's going to be, you know, 33,

11   34 when he gets out, somewhere in that vicinity.  He's gotten

12   to the point where he's getting close to what we call aging

13   out, which obviously you can always commit crimes, even later

14   in life, but the statistics tell us that the older you get, the

15   less likely you are to repeat, and Mr. Hudson I think really is

16   committed to that.

17           He talks about his children.  He certainly wants to be

18   the type of father that he didn't have when he was growing up.

19   And I really do believe he's ready to move on with his life.

20           So the real question, Judge, is, do the extra ten

21   months really have to be imposed, or even more extra, a year?

22   I know your Honor has a 17-month guideline range, but probation

23   is recommending 70 months, so I'm looking at the differential

24   between 60 and 70 as the playing field, so to speak, without,

25   obviously, stepping on the Court's discretion.

Jb61huds

1          Is it necessary?  Or is it greater than necessary?  I

2    think 60 months accomplishes the purposes of 3553(a), and I'd

3    ask your Honor to impose a sentence of 60 months.

4          I would also include in that, given Mr. Hudson's

5    substance abuse history, that he be designated to a facility

6    where he at least has the opportunity, or where he could

7    possibly get into an RDAP program, the residential drug

8    treatment program.  All the outpatient programs he's gone to

9    have not quite accomplished it.  I think this is a program that

10   has been shown to be effective; certainly among the clients

11   that I've had, many of them have had it and have managed to

12   stay clean.  So I think it is one of the programs at the BOP

13   that is successful, and I'd ask the Court to include that in

14   its recommendation, wherever he is designated.

15          THE COURT:  Sir, before you sit down, in your

16   submission to me there were discussions about things that

17   Mr. Hudson was doing while incarcerated to perhaps better

18   himself, to prepare for re-entry, however you'd like to look at

19   it.  And so one thing was his seeking and obtaining a position

20   in the culinary arts, which is where he is very interested.  I

21   thought there was discussion as well about him studying for --

22          MR. MOSKOWITZ:  Studying for his GED, yes.

23          THE COURT:  Has he taken it?

24          THE DEFENDANT:  No.  Never got a chance to.

25          THE COURT:  It is his intention to take it at some

Jb61huds

1    point.

2         MR. MOSKOWITZ:  Yes.

3         THE COURT:  I'm aware, and I know you're aware, that

4    there aren't an enormous number of programs that one can take

5    in either of the transitional facilities that would serve this

6    courthouse.  I didn't know if there were specific things he

7    wanted me to know about courses he had taken or programs he had

8    done or things of that nature.

9         MR. MOSKOWITZ:  I think, Judge, his work history and

10   the -- it was really interesting for me to see his

11   relationship, just even with the COs at the MCC, as somebody

12   who works in the kitchen.  It is a responsible job.  It is one

13   that he is apparently quite good at, and one that everybody in

14   the facility seems to know and associate with him.  So I think

15   that -- and it's one that requires him to be up very early and

16   work quite long hours.  So I think that has probably diminished

17   his ability to be in some of the other programs that might

18   otherwise have been available to him.  I know that when I see

19   him, he's normally quite exhausted from the work that he's been

20   doing, so I think that he's made that decision that that was

21   the most productive use of his time and it allowed him to do

22   something that he liked, and one where I think he's hoping to

23   have a future in when he gets out.

24        THE COURT:  Thank you for letting me know.  I'll let

25   you get back to your client.

Jb61huds

1          Mr. Hudson, you are invited to speak to me if you want
2     to.  I do want to make clear at the outset that you're not
3     under any obligation to speak with me at this time, and I have
4     read the written submission that you gave to me.  It was
5     attached as an exhibit to your attorney's submission.  But if
6     at this time there's something you'd like to say to me, I'd be
7     happy to hear from you.  I'd just ask this, sir.  Given this
8     courtroom, I'll ask you to take the microphone that's to your
9     left, or maybe to your right, bring it a little bit closer to
10    you, and if you could please speak slower and louder than you
11    think you need to so we all can hear you.  Thank you, sir.
12          THE DEFENDANT:  What can I say.  Good afternoon.
13          THE COURT:  Good afternoon, sir.
14          THE DEFENDANT:  I want to thank my family for showing
15    up for me today.  I appreciate that, and I love each and every
16    one of them, and I'm sorry for them having to go through this,
17    what I'm going through right now, 'cause they going through it
18    with me too.
19          Your Honor, I'm a changed person.  I've been a changed
20    person for the last four to five years.  Ever since my
21    grandmother passed, I've been on the right path.  Yes, I made
22    stupid decisions that got me in here, but deep down, I am a
23    changed person.
24          And that's all I got to say.
25          THE COURT:  Okay.  Thank you very much.

Jb61huds

1              Mr. Hudson, when I sentence someone, I do not come on
2      the bench with a decision in mind because it is very important
3      for me to keep an open mind until I've heard from everyone, and
4      I've now heard from you.  I'm going to gather together the
5      notes that I've taken today and the notes that I took on the
6      written submissions, and I'm going to step off the bench for
7      about five or ten minutes, and then I'll come back with a
8      sentence.  I just want to make clear that it is not my
9      intention to intensify any anxiety you might have; it's just to
10     me the fairest way of addressing this.  So I'm going to ask for
11     your patience while I do what I need to do, and I'm going to
12     ask the Marshals if they would please permit you to speak with
13     your family members, since they've come here to see you today.
14              I'll be back when I can.  Thank you very much.
15              THE DEPUTY CLERK:  All rise.
16              (Recess)
17              (In open court)
18              THE COURT:  Thank you very much, and please be seated.
19              I will describe the sentence that I now intend to
20     impose, but I will give the attorneys an opportunity to make
21     legal objections before I actually impose the sentence.
22              Before I do that, I want to just extend my
23     appreciation to a couple of different groups of people today.
24     My thanks to the attorneys who have given me a lot to think
25     about in both the written submissions and the oral

Jb61huds

1    presentations today, and my thanks as well to the family

2    members who have come to show their support for Mr. Hudson.

3    Some of you have written to me, and your writings have given me

4    a different perspective, one that I wouldn't get from a rap

5    sheet or from the conduct in this case, so I appreciate that,

6    and I'm sure that Mr. Hudson is aware of your devotion to and

7    appreciation of him, and I'm sure he appreciates that as well.

8    So I wanted to thank you for coming here today.

9            So as I said, I really appreciated the statements made

10   by counsel because I think they both have some very valid

11   points, and I'll talk about them in just a minute.  But I want

12   to begin by noting the factors that I have to consider under

13   Section 3553(a) in imposing a sentence.  And not all of these

14   have equal relevance, so I'll just mention the ones I have

15   focused on the most:  The nature and circumstances of the

16   offense; the history and characteristics of the defendant; the

17   need for the sentence imposed to reflect the seriousness of the

18   offense, to promote respect for the law, to provide a just

19   punishment for the offense, to afford adequate deterrence to

20   criminal conduct, to protect the public from further crimes by

21   Mr. Hudson, to provide him with needed educational and

22   vocational training, medical care, or other correctional

23   treatment in the most effective manner; I must consider the

24   Sentencing Guidelines, and I will speak about them momentarily;

25   and I must consider the need to avoid unwarranted sentence

Jb61huds

1    disparities amongst similarly situated defendants.

2            My guidelines calculations replicate those in the

3    presentence investigation report.  There is a base offense

4    level of 28; under guidelines Section 2D1.1, a three-level

5    reduction for acceptance of responsibility, and an adjusted

6    offense level of 25.  Mr. Hudson has four criminal history

7    points, yielding a criminal history category of III, and a

8    resulting guidelines range of 70 to 87 months.

9            I've been asked by the defense to focus on the

10   parsimony provision, which I do, because it is there, and it

11   requires me to impose a sentence that is sufficient but not

12   greater than necessary to comport with certain sentencing

13   factors that are set forth.

14           I also, though, need to step back and consider the

15   factors themselves, and I've done that, and I've focused on

16   some in particular, including the seriousness of the offense

17   and the history and characteristics of Mr. Hudson, the need for

18   deterrence, and, in this case, because both sides have argued

19   it to me, the need to avoid unwarranted sentence disparities

20   amongst similarly situated defendants.

21           I've been asked to compare, or contrast, Mr. Hudson's

22   background with that of Mr. Padilla, who received 66 months

23   from me.  As it happens, they have the same guidelines range,

24   with one having a higher amount of product and the other having

25   a greater criminal history category.  Both are subject to the

Jb61huds

1    same mandatory minimum.  It matters to me certain ways in which

2    the two differ.  Mr. Hudson has a greater criminal history

3    category.  He has more violence in his background.  There is

4    the use of a gun, and there is a concern about violence from

5    that.  I'm also a little bit concerned about some of his

6    statements to me today.  Mr. Hudson indicated that he had

7    changed in the last five years, but based on my understanding

8    of what's in the presentence investigation report, he was

9    engaged in this conduct during that period of time.  I hope,

10   and Mr. Moskowitz wants to assure me, that Mr. Hudson has

11   learned from this experience and that he is not going to repeat

12   past mistakes.  I hope that's the case.

13          But given that he has a slightly different and a

14   slightly more violent criminal history category, I'm imposing a

15   term of 68 months' imprisonment.  I'm varying downward, but

16   just slightly, because I do think, having sentenced

17   Mr. Padilla, he has a different and a more troubling background

18   than Mr. Padilla.

19          And I'm ordering that the term of imprisonment be

20   followed by a term of supervised release of four years, with

21   the mandatory, standard, and special conditions of supervised

22   release.

23          I am not imposing a fine or restitution or forfeiture,

24   but I am obligated to impose a $100 mandatory special

25   assessment.

Jb61huds

1          Mr. Balsamello, is there any reason why I may not

2     impose this sentence?

3          MR. BALSAMELLO:  No, your Honor.

4          THE COURT:  Mr. Moskowitz, is there any reason why I

5     may not impose this sentence?

6          MR. MOSKOWITZ:  No, your Honor.

7          THE COURT:  Thank you.

8          Mr. Hudson, please rise.

9          Mr. Hudson, after considering all of the factors set

10    forth in Section 3553(a) of Title 18 of the United States Code,

11    I find that a term of 68 months' imprisonment is sufficient but

12    no greater than necessary to comport with all of the purposes

13    of sentencing.

14          I will order that that term of imprisonment be

15    followed by the mandatory minimum term of four years of

16    supervised release, with the mandatory, standard, and special

17    conditions that are outlined in the presentence investigation

18    report.

19          I am not imposing a fine or restitution or forfeiture,

20    but I must impose a $100 mandatory special assessment.

21          Do you understand that, sir?

22          THE DEFENDANT:  Yes.

23          THE COURT:  Please be seated, sir.

24          Mr. Moskowitz, there was a request for the RDAP

25    program.  I will certainly make that recommendation.

Jb61huds

1              Does your client have a requested place of

2    designation?

3              MR. MOSKOWITZ:  Just within the northeast region, as

4    close to New York as possible.  As you can see, there is family

5    that would like to visit, and the closer the better.  So I

6    guess it's a facility within the region that has RDAP.

7              THE COURT:  That is in fact the recommendation we will

8    make.  We'll have it as close to the New York City metropolitan

9    area as possible.

10             Mr. Moskowitz, are there any additional

11   recommendations you would like me to make for your client?

12             MR. MOSKOWITZ:  No, your Honor.  Thank you.

13             THE COURT:  Thank you.

14             Mr. Balsamello, are there any underlying charging

15   instruments as to which you seek dismissal?

16             MR. BALSAMELLO:  I don't believe that there are.  If

17   there are, I move to dismiss them, but I don't believe there

18   are.

19             THE COURT:  I don't believe there are.

20             Mr. Moskowitz, are you aware of any underlying

21   charging instruments with respect to your client?

22             MR. MOSKOWITZ:  No, your Honor.

23             THE COURT:  All right, then.  I don't want to have

24   then a nullity of dismissing things that aren't there, so I

25   won't do that.

Jb61huds

1          Mr. Balsamello, is there anything else from the

2    government's perspective that you would like to bring up at

3    this proceeding?

4          MR. BALSAMELLO:  No, your Honor.  Thank you.

5          THE COURT:  All right.  Thank you.

6          Let me please advise Mr. Hudson of this.  Mr. Hudson,

7    to the extent that you have not waived this in any plea

8    agreement that you may have with the government, you have the

9    right to appeal from your conviction and from your sentence.

10   If appeal is something that you're interested in, please speak

11   with Mr. Moskowitz at your earliest opportunity.  Generally

12   speaking, you have two weeks from the date that the written

13   judgment of conviction is entered in order to file a notice of

14   appeal.  It's my expectation that the written judgment of

15   conviction will be entered probably tomorrow.  I don't think it

16   will get in today, and I hope to have it done tomorrow.  So

17   from there, I'll imagine you have two weeks to decide what you

18   wish to do.  If you're interested at all in the process of

19   appeal, please speak with Mr. Moskowitz as soon as you can.  He

20   is familiar with the process, and he can explain to you the

21   first steps that you would need to take.  Do you understand,

22   sir?

23         THE DEFENDANT:  Yes.

24         THE COURT:  All right.  Mr. Moskowitz, is there

25   anything else you wish to bring to my attention on behalf of

Jb61huds

1    your client?

2              MR. MOSKOWITZ:  Not at this time, your Honor.  Thank

3    you.

4              THE COURT:  All right.  Thank you very much.

5              Mr. Hudson, you were very, very well served by your

6    counsel, and he did a lot to make me see the many ways in which

7    you're trying to change your life.  Today, before me, and

8    before your family and loved ones, you also committed to

9    changing your life and to taking a different path than that

10   which you've taken in the past.  I'm sure that you will do that

11   when you leave, but I'm sure that you will remember and always

12   be a credit to the woman who raised you and who you still

13   treasure so deeply in your heart.  I will simply tell you, sir,

14   it's my hope that you and I not see each other in this context

15   again.  That will mean you will have violated your conditions

16   of supervised release, and I don't -- well, I can imagine you

17   don't want to see me in this context again, and I will take no

18   offense if that's the case.  But my hope is that while you are

19   incarcerated, you make use of whatever programs the BOP offers

20   in your place of designation to better yourself, to get the

21   experience that you want, to get the GED that I agree will help

22   you out so much in your life, and that you leave prison with a

23   renewed hope and focus, and I wish you well in that regard,

24   sir.

25             THE DEFENDANT:  Thank you.

Jb61huds

1          THE COURT:  All right.  Thank you very much.  We're

2   adjourned.

3          THE DEPUTY CLERK:  All rise.

4                           O0o,

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25